**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **NUKOTE INTERNATIONAL, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:09-0921** |
| | ) | **Judge Trauger** |
| **OFFICE DEPOT, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**<u>MEMORANDUM</u>**

Pending before the court is a Motion to Withdraw the Reference, Transfer Venue, and

Extend the Time to Respond to the Complaint filed by the defendant, Office Depot, Inc. (Docket

No. 1).[1]  For the reasons discussed herein, the defendant's motion will be granted, and this case

will be transferred to the United States District Court for the Southern District of Florida (West

Palm Beach Division).

**<u>RELEVANT FACTUAL AND PROCEDURAL BACKGROUND</u>**

The plaintiff, Nukote International, Inc. ("Nukote") manufacturers and distributes office

products for use with printers, copiers and fax machines, and the defendant is a well-known

retailer of such products, among other office supplies.[2]  The plaintiff has approximately 1,100

---

[1] The plaintiff requested oral argument on this motion.  (Docket No. 3 at 1.)  The briefing from the parties on the issues raised by this motion was clear, thorough and informative, and oral argument is unnecessary.

[2] Unless otherwise noted, the facts are drawn from the Complaint filed by Nukote in the underlying Bankruptcy Court adversary proceedings in this district.  (Bankruptcy Court Case No. 09-00341A, Docket No. 1.)

employees worldwide and substantial business operations, including manufacturing, distribution, administrative, and customer service facilities located in various locations in the United States, Mexico, and the United Kingdom.  Specifically, the plaintiff has its executive and corporate headquarters in Plano, Texas, and its administrative offices in Rochester, New York.  One of the plaintiff's distribution centers is located in Franklin, Tennessee, which is within this judicial district.

For almost twenty years prior to the present dispute, the plaintiff and the defendant had a mutually productive business relationship in which the defendant purchased a wide variety of the plaintiff's products and in which, in some areas, the plaintiff was essentially the defendant's exclusive supplier.  Indeed, the parties' relationship grew over this two-decade period to a point where, in 2007, the defendant was the plaintiff's largest customer, producing sales of more than $85,000,000 per year for the plaintiff.  The increase in sales caused the plaintiff to expand its business operations to accommodate the defendant.

The business relationship between the two parties was, not surprisingly, governed by contract.  In 2006, the parties executed the "2006 Vendor Purchasing Profile for All Vendors," which has remained in place with various amendments since that time.  The parties do not dispute that their operative agreement has a choice of law provision requiring that Florida law be applied to any dispute between the parties under the Agreement, and a forum selection clause that requires that all litigation between the parties be conducted in Palm Breach County, Florida.[3]

---

[3]Specifically, the choice of law provision from the 2006 Agreement states: "[t]his agreement, its interpretation, performance or any breach thereof, shall be construed in accordance with, and all questions with respect thereto shall be determined by the laws of the State of Florida," and the forum selection provision states: "any litigation between the parties shall be conducted in federal court in Palm Beach County, if federal jurisdiction exists.  If

Part of the contractual arrangement between the parties involved a recycling program, in which the defendant would provide the plaintiff with used ink and toner cartridges that were returned to the defendant's stores by customers.  The plaintiff would then use these cartridges for raw materials and would credit the defendant's account (at an agreed upon price per cartridge). Given the generally mutually beneficial nature of their relationship, the parties worked out a system whereby the defendant would apply the credits it had earned at regular and consistent times, allowing the plaintiff to better anticipate its cash flow.

Beginning in 2007 and accelerating in the latter part of 2008 and in the early part of 2009, with the precipitous downtown in the U.S. economy, the plaintiff alleges that the defendant began accelerating the pace at which it took credits and rebates, both in the recycling program discussed above and elsewhere.  This conduct deprived the plaintiff of cash that it had relied upon receiving.  Indeed, the plaintiff alleges that, in the final quarter of 2008 and in the first quarter of 2009, it lost roughly $7.1 million in cash as a result of these unanticipated maneuvers by the defendant.

Despite assurances from the defendant that business would return to normal eventually, the plaintiff alleges that the defendant continued taking "accelerated credits" and started simply withholding payment, with this conduct becoming especially pronounced in March and April 2009.  The plaintiff alleges that it continued to try and resolve these payment issues with the defendant because of the importance of the defendant to the plaintiff's continued survival as a business and that, despite the withholding of payment, these efforts at resolution produced

_____

federal jurisdiction does not exist, then the matter may be litigated in state court in Palm Beach County, Florida."  (Bankruptcy Court Case No. 09-00341A, Docket No. 1 Ex. 1 at 16.)

communications of a "positive and hopeful" nature.

The plaintiff alleges that, on May 8, 2009, the defendant announced that it was designating Clover Technologies Group, Inc., as its new supplier of the product lines that had been serviced by the plaintiff. The plaintiff contends that this conduct was a "blatant and open breach" of the continuing contractual relationship between the parties and a "devastating blow" to the plaintiff's operations. The plaintiff contends that, "as a direct result" of the breakdown of its business relationship with the defendant, the plaintiff was forced to file for Chapter 11 bankruptcy protection, which it did, in this district, on June 3, 2009.

On September 8, 2009, the plaintiff filed an adversary proceeding in the Bankruptcy Court against the defendant. The nine counts of the Complaint are: (1) breach of contract, (2) fraudulent misrepresentation, (3) negligent misrepresentation, (4) failure to pay for goods delivered and accepted under Florida statutory law, (5) Section 542 of the Bankruptcy Code – Turnover of Amounts Due for Deductions and Credits, (6) Section 542 of the Bankruptcy Code – Turnover of Amounts Due for Untaken and Unsold Goods, (7) Section 542 of the Bankruptcy Code – Turnover of Past Due Account, (8) anticipatory repudiation of requirements contracts under Florida statutory law and (9) attorneys' fees. On October 2, 2009, the defendant initiated proceedings in this court by filing the pending motion.

## ANALYSIS

The plaintiff, as Debtor, has initiated an adversary proceeding in the Bankruptcy Court in this district. The defendant has filed a Motion to Withdraw the Reference, asking this court to remove the adversary proceeding from the Bankruptcy Court and also asking the court to then transfer the action to the United States District Court for the Southern District of Florida (West

Palm Beach Division) under 28 U.S.C. § 1404.

## I.        **Motion to Withdraw**

Section 28 U.S.C. § 157(d) dictates when a district court should withdraw a matter (such as the pending one) from the Bankruptcy Court.  This provision contains both a mandatory and a permissive prong.  As to mandatory withdrawal, Section 157(d) states: "[t]he district court shall, on timely motion of a party, [] withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce."  The section states as to permissive withdrawal: "the district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown."  *Id.*  As the plaintiff's Complaint facially arises under state law and Section 542 of the Bankruptcy Code, the defendant does not suggest that any withdrawal here would be mandatory.  (Docket No. 2 at 6.)  Rather, the defendant argues that this case is appropriate for permissive withdrawal under the "for cause shown" standard.

While Section 157(d) does not define the showing that must be made to establish "cause" to withdraw, some courts in this Circuit have found that the movant must meet a high bar in order to justify permissively removing a matter from the capable hands of the Bankruptcy Court. *In re Federated Dep't Stores, Inc.*, 189 B.R. 142, 144 (S.D. Ohio 1995)(stating that there must be a "clear demonstration of cause" and "extraordinary circumstances" in order to withdraw the reference); *see also In re Washington Mfg. Co.*, 133 B.R. 113, 116 (M.D. Tenn. 1991)("the Court finds that the 'cause' standard in the non-mandatory withdrawal provision is a high one . . . only a compelling cause warrants withdrawal from the automatic reference to bankruptcy under the

non-mandatory provision.")

While there may be a presumption in favor of leaving an adversary proceeding in the Bankruptcy Court, it is certainly not impossible to make the required showing that withdrawal is appropriate, and the district court retains ample discretion in making the decision to withdraw the reference. *In re Enron Corp.*, 295 B.R. 21, 25 (S.D.N.Y. 2003)(noting that the district court retains "broad discretion" in this area); *Messinger v. Chubb Group of Ins. Companies*, 2007 WL 1466835, *1 (N.D. Ohio May 16, 2007)(the decision to withdraw the reference under the permissive element is "discretionary" and "rests squarely" with the district court).

Indeed, while there appears to be little Sixth Circuit law on the issue, courts generally consider several broad factors in evaluating whether to withdraw the reference under the permissive prong of Section 157(d). That is, a court should consider "(1) whether the claim is core or non-core, (2) what is the most efficient use of judicial resources, (3) what is the delay and what are the costs to the parties, (4) what will promote uniformity of bankruptcy administration, (5) what will prevent forum shopping, and (6) other related factors," such as expediency of the bankruptcy process and whether there has been a jury trial demand. *CNH Am., LLC v. Venture Indus. Corp.*, 344 B.R. 526, 528-29 (E.D. Mich 2006)(quoting *In re Burger Boys, Inc.*, 94 F.3d 755, 762 (2nd Cir. 1996)); *see also In re Enron Corp.*, 295 B.R. at 25.

**A.      Core v. Non-Core**

The first factor is whether the adversary proceeding is "core" or "non-core." Section 157(b) provides a non-exclusive list of "core" proceedings, such as "matters concerning the administration of the estate," "orders to turn over property of the estate," and "confirmation of plans." 28 U.S.C. § 157(b)(2). While some of the items on this list could, in theory, be

interpreted such that an exceptionally broad array of matters would be considered "core," the Sixth Circuit has clarified that core proceedings are those that involve rights provided by federal bankruptcy law and that arise in the context of the bankruptcy. Indeed, "if the proceeding does not invoke a substantive right created by federal bankruptcy law and is one that could exist outside of the bankruptcy, then it is not a core proceeding." *In re Wolverine Radio Co*, 930 F.2d 1132, 1144 (6th Cir. 1991).

Consistent with this, other courts in this Circuit have found that contract actions and similar matters that plainly arise independent of the Bankruptcy Code and the debtor's Petition must be treated as non-core. *See e.g. In re McCrary & Dunlap Construction Co.*, 256 B.R. 264, 267 (M.D. Tenn. 2000)(collecting cases and finding "claims . . . when grounded in state law and arising pre-petition, must be treated as non-core"); *In re Skyline Concrete Floor Corp.*, 2008 WL 114462, *1-2 (E.D. Mich. Jan. 8, 2008)(where "all of the claims in this adversary proceeding involve rights created by state law," the matter is "non-core."); *Messinger*, 2007 WL 1466835 at *2 (N.D. Ohio May 16, 2007)(matter was "non-core" where the legal issues were state law claims of "breach of contract, breach of fiduciary duty and requested declaratory relief . . . aris[ing] out of an insurance coverage dispute [with] . . . no discernible relationship to the resolution of the bankruptcy proceeding. . . . Such an action, seeking to adjudicate primarily private causes of action, is distinct from the restructuring of debtor-creditor relations, which forms the heart of the federal bankruptcy court's jurisdiction.")

The defendant argues that, consistent with the case law above, this matter must be viewed as "non-core." (Docket No. 2 at 7-8.) That is, even assuming that the allegations in the Complaint are true, the relevant conduct all occurred pre-petition and the claims are all rooted in

state law.  (*Id.*)  The defendant recognizes that three of the claims in the Complaint are stated as

"turnover" claims under Section 542 of the Bankruptcy Code but argues that this is simply

disingenuous pleading by the plaintiff.  That is, the defendant contends that the plaintiff has

simply (and improperly) restated its breach of contract and "failure to pay for goods delivered

and accepted under Florida statute" claims as "turnover" claims and, therefore, this matter still is

a creature of state law and should be treated as such in this analysis.[4]  (*Id.* at 9.)

      In response, the plaintiff argues that this matter does, in fact, involve "core" claims.

(Docket No. 3 at 7.)  The plaintiff states that "a very important part of the Adversary Proceeding

is Nukote's request for turnover of funds under [Section 542], which is a core matter pursuant to

[Section 157(b)]."  (*Id.*)

      Therefore, much of this dispute about whether the allegations are "core" comes down to

the weight that the court should afford the plaintiff's "turnover" claims.[5]  The defendant provides

---

[4] The defendant is correct that the turnover claims in the Complaint are clearly rooted in the underlying contract dispute.  For instance, the claims are pled in the alternative to the other counts, and the factual allegations in the Complaint are incorporated into the counts. (Bankruptcy Court Case No. 09-00341A, Docket No. 1 at 19-20.)  Also, specifically, Count 5 claims that the "Operative Agreements provide for various deductions" and "there exist amounts due" in conjunction with those deductions.  (*Id.* at 19.)  Count 6 alleges that the defendant breached the Agreement by not paying for goods in violation of Florida law, and then simply states the amounts that the goods are worth for "turnover" purposes.  (*Id.* at 19-20.)  And, finally, Count 7 alleges that the defendant breached a conditional provision in the Agreement between the parties that dictated that the plaintiff would forgive a $900,000 receivable in exchange for a certain level of business from the defendant.  (*Id.* at 20.)  The plaintiff simply claims that, because the defendant breached the Agreement, and, therefore, did not provide the level of business required, it is owed $900,000.  (*Id.*)

[5] The remainder of the plaintiff's argument in support of this matter being "core" is not compelling.  The plaintiff contends that "the Adversary Proceeding is also core because it concerns the administration of the estate, confirmation of the Plan, and liquidation of the assets," in that the "net recoveries from the [Adversary Proceeding] are intended to be a substantial source of payment to the creditors under the Plan."  (Docket No. 3 at 8.)  Under this brand of

the court with a wealth of case law demonstrating that "turnover proceedings involve return of *undisputed* funds," and, therefore, given that there is a dispute over whether money is owed in this case, the plaintiff's claims in Counts 5-7 are not proper turnover claims.  *In re Gurga*, 176 B.R. 196, 199 (9th Cir. 1994)(emphasis in original).  Indeed, "the words 'to turnover property of the estate' are terms of art in the bankruptcy context . . . .  Section 542 deals with debts which are matured, payable on demand, or payable on order.  . . . When, instead, an adversary proceeding presents a bona fide dispute as to liability, the matter cannot be viewed as a turnover proceeding under 28 U.S.C. § 157(b)(2)."  *In re Dayton Title Agency, Inc.*, 264 B.R. 880, 883 (S.D. Ohio 2000).

In response, the plaintiff only meekly argues that the defendant has not sufficiently shown that Counts 5-7 are subject to a "bona fide dispute as to liability."  (Docket No. 3 at 8.)  It is not clear what the plaintiff would have the defendant do in order to indicate the "bona fide" nature of the dispute.  In *Dayton*, the case from which the "bona fide dispute" language is drawn, there is no indication that the defendant did anything more than challenge the sums claimed through a motion, which was apparently sufficient to generate a "bona fide" dispute in that case.  264 B.R. at 883-84 (simply noting that the claims were "disputed" and, therefore, were not valid turnover claims).  The defendant repeatedly stresses its desire to file a Motion to Dismiss in the appropriate court, clearly challenging that it owes the plaintiff anything and also presenting a "bona fide" dispute.  (Docket No. 2 at 19.)  As the sums claimed by the plaintiff are disputed, the

---

argument, almost all matters involving a debtor seeking money from another litigant could be considered core, even if the dispute had no direct connection to the debtor's bankruptcy.  Based on the law discussed above, this is clearly not the intent of the statute as interpreted by the Sixth Circuit.

plaintiff's assertion of "turnover" claims should be afforded little merit in weighing whether the claims here are "core" or "non-core."

As the plaintiff's Complaint, in essence, alleges violations of state statutory and common law that occurred pre-petition, the court concludes that the claims here are "non-core." This conclusion tips the balance heavily in favor of withdrawing the reference. *See In re Burger Boys*, 94 F.3d at 762; *Gecker v. Marathon Fin. Ins. Co., Inc.*, 391 B.R. 613, 615 (N.D. Ill. 2008)("The most important factor is whether a proceeding is core or non-core, because efficiency, uniformity and judicial economy concerns are largely subsumed within it.")(internal quotation omitted). As the *Messinger* court cogently explained, "whether a proceeding is core or non-core is the most important factor in deciding a motion to withdraw reference. . . . it makes more sense for a court of broader jurisdiction to consider the potentially broad range of legal issues present in a non-core proceeding." 2007 WL 1466835 at*2 (internal quotation omitted). That said, other factors can, in theory, tip the balance in favor of leaving a non-core proceeding in the Bankruptcy Court. *See Gecker*, 391 B.R. at 615 ("the fact that a proceeding is non-core, by itself, does not establish 'cause' to withdraw. . . . additional circumstances may be required to justify withdrawal of the reference.")(internal quotation and citation omitted).

**B.      Judicial Economy**

As noted above, the conclusion that the matter is "non-core" often influences the other factors in the Section 157(d) permissive withdrawal analysis. That is, in a non-core proceeding, where the gravamen of the Complaint does not concern bankruptcy law, courts have often concluded that judicial economy is better served by withdrawing the reference and allowing a court of general jurisdiction to resolve the matter. *See e.g. Messinger*, 2007 WL 1466835 at *2

("the court deciding this adversary proceeding will be faced with issues of contract interpretation, insurance law and federal declaratory judgment standards.  While these issues certainly are not outside the scope of what a bankruptcy court can do, they equally are not within the specialized grant of jurisdiction to the bankruptcy court, and that distinction guides this Court to favor withdrawal.")

The defendant argues that these concerns are particularly acute here, because the defendant is not a party to the bankruptcy proceedings and the Complaint involves issues of Florida state law that have nothing to do with bankruptcy law and that "are not generally within a bankruptcy court's expertise."  (Docket No. 2 at 12.)  The defendant also points out that this case is relatively new and, therefore, the "bankruptcy court has not developed unique knowledge of the facts or legal issues presented in this specific lawsuit."  (*Id.*)

In response, the plaintiff contends that "several hearings" regarding Nukote's financial condition have already been conducted and that a "centralized venue favors efficient administration of the estate."  (Docket No. 3 at 9, 12.)  The plaintiff also contends that "there has not been, nor does Nukote believe there could be, any sustainable allegation that the Bankruptcy Court lacks the resources, skill or capability to try the issues presented in the Adversary Proceeding in a timely and efficient manner."  (*Id.* at 12.)

As to the plaintiff's first point, again, as noted above, there is little connection between the formal administration of the estate and this litigation, and the fact that the plaintiff is a Debtor in bankruptcy does not afford the plaintiff the privilege of having all of its litigation conducted in the Bankruptcy Court.   As to the second point, the issue is not whether the Bankruptcy Court could resolve the issues (which, of course, it could).  The key issue is how to

11

put the resources of the judicial system to the best use.  The defendant's argument, that the resources of the system will be most efficiently used by trying this complex case (which involves foreign, non-bankruptcy law and precipitating events that occurred pre-petition) outside of Bankruptcy Court is certainly compelling.[6]  Therefore, the judicial economy factor favors the withdrawal of the reference.

### C.      Delay and Uniformity

Related to the argument above, the defendant argues that both the "delay" and "uniformity" factors, as applied here, suggest that withdrawal is appropriate.  That is, given that this case involves "non-core, pre-petition claims arising under Florida law" and discovery between the parties promises to be "massive," the interests of expediency demand that this case be handled outside of a bankruptcy court.  (Docket No. 2 at 13.)  As to uniformity, the defendant also argues that, because "the issues in this adversary proceeding are not bankruptcy issues" there is no risk to the uniform nature of Bankruptcy Code administration.  (*Id.* at 14.)

_____

[6]The plaintiff also argues that, even if the court is inclined to withdraw the reference at some point, it should wait to do so until the pretrial discovery has been conducted.  (Docket No. 3 at 10-11.)  The plaintiff cites several non-controlling cases for the proposition that the court has the option of leaving this case with the Bankruptcy Court for pretrial administration and then withdrawing the reference when the case is ready for trial.  (*Id.* citing, *e.g., In re Adelphi Institute*, 112 B.R. 534, 538 (S.D.N.Y. 1990); *In re Hardesty*, 190 B.R. 653, 657 (D. Kan. 1995)).  While the plaintiff shows that the court, in certain circumstances, has the option of leaving this case in the Bankruptcy Court for pretrial preparation, it shows little, if any, basis for actually doing so.  Again, there is little connection between bankruptcy law and this case, and, therefore, it strikes the court as entirely proper, and likely more efficient, for a district court of general jurisdiction to handle the case from its initial stages onward.  Also, as will be discussed more below, the relevant Agreement in this case has a forum selection clause that dictates that litigation between the two parties will be resolved in Florida.  While this clause does not necessarily require that litigation between these parties be conducted in Florida, it certainly further guides the court away from any notion that the pretrial matters should be left to the Bankruptcy Court or that the case, overall, could be more efficiently and certainly resolved in the Bankruptcy Court.

In response, the plaintiff largely restates the unpersuasive arguments above, contending that "retaining the reference will undoubtedly expedite the bankruptcy process."  (Docket No. 3 at 13.)  The plaintiff also argues, in somewhat conclusory fashion, that the District Court likely has a more crowded docket and that "the Bankruptcy Court is in a better position to quickly move the case along, concurrently with Nukote's progress toward confirmation of its Plan." (*Id.*)  The plaintiff also claims that the "success of the Plan" is "inextricably intertwined with the pursuit of the litigation," and, therefore, the Bankruptcy Court should hear the "litigation at the heart of th[e] Plan." (*Id.* at 14.)

As discussed above, because of the lack of direct connection between the bankruptcy petition and the adversary proceeding, the plaintiff's arguments regarding expediency are misplaced.  It is also worth noting that, as discussed in the defendant's Reply, the plaintiff's Plan "contemplates confirmation by the end of the year."  (Docket No. 27 at 5.)  Therefore, given the complexity of the adversary proceeding, it is impossible to believe that the adversary proceeding and the plan confirmation could proceed in any sort of tandem, a point that was recognized by Judge Lundin at a recent hearing on the adversary proceeding.  (Docket No. 27 Ex. 1 at 14-16.) Again, the defendant's argument that the interests of efficiency and economy are best served by withdrawal are compelling, and the plaintiff's argument in response is unconvincing.  Therefore, these factors also favor withdrawal of the reference.[7]

### D.    Forum Shopping

The defendant argues that withdrawal of the case is favored under this factor, as the

---

[7]Also, consistent with the defendant's unchallenged argument, the court sees no threat to the uniformity of the administration of the Bankruptcy Code by withdrawing the reference.

plaintiff filed this lawsuit in a jurisdiction other than the one to which the parties agreed, apparently "perceiv[ing] some advantage in its preferred forum." (Docket No. 2 at 14.) The plaintiff briefly responds, arguing that it is the defendant who is forum shopping "desperately [trying] to avoid the Bankruptcy Court for some unknown reason." (Docket No. 3 at 13.) The parties basically duel this issue to a draw, both arguing, in conclusory fashion, that the other is trying to avoid the proper jurisdiction.

Clearly, however, a review of the relevant factors shows that the defendant has met the "high bar" of showing that withdrawal of this matter is appropriate.[8] Therefore, the court now turns to the issue of whether the withdrawn case should be transferred to the United States District Court for the Southern District of Florida (West Palm Beach Division).

## II.   Motion to Transfer

Section 1404(a) dictates that, "for the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). In determining whether to transfer a

---

[8] The plaintiff makes two additional, non-compelling arguments. First, the plaintiff points out that the defendant "has made no demand for a jury trial," and, without providing any citation, argues that "assertion of a right to a trial by jury is [] the most common reason a withdrawal of the reference is sought" and that the "right to trial by jury" is the "most prominent factor" in the analysis. (Docket No. 3 at 14.) As discussed above, ample case law supports the withdrawal of reference here, where the case is "non-core" and there is little additional basis provided for leaving the matter before the Bankruptcy Court. Second, the plaintiff argues that, even if the court decides to withdraw the reference, it should "refer the recalled matter back to the Bankruptcy Court for Report and Recommendation." (*Id.* at 14.) This argument is very similar to the previous argument that the court should leave the matter with the Bankruptcy Court for pretrial determination. Again, the plaintiff merely points out that the District Court, in theory, has this option but shows no basis for why, in this case with its limited connection to any core bankruptcy issues, such an action would be appropriate. Therefore, both of these arguments are without merit.

14

case pursuant to Section 1404(a), a district court should consider a number of "case-specific factors," including the existence of a forum selection clause, as well as "the private interests of the parties, including their convenience and the convenience of potential witnesses, as well as other public-interest concerns, such as systemic integrity and fairness, which come under the rubric of 'interests of justice.'"   *Moses v. Business Card Exp.*, 929 F.2d 1131, 1136-37 (6th Cir. 1991).

The defendant's Motion to Transfer is primarily based on the forum selection clause in the parties' Agreement, which states that "any litigation between the parties shall be conducted in federal court in Palm Beach County, if federal jurisdiction exists."  (*See* Docket No. 2 at 16-17.)  The parties appear to be in agreement that federal jurisdiction would exist under 28 U.S.C. § 1334(b), because, although this is not a "core" case, it is still "related to" a bankruptcy.  (*Id*.; see also *In re Wolverine Radio Co*, 930 F.2d at 1141)("the circuit courts have uniformly adopted an expansive definition of a related proceeding . . . .  An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action . . . and which in any way impacts upon the handling and administration of the bankrupt estate.")(internal quotation omitted).

For purposes of the Section 1404 analysis, a forum selection clause is "a significant factor that figures centrally" in the determination of whether to transfer the case.  *Moses*, 929 F.2d at 1136.  The existence of that clause "should receive neither dispositive consideration . . . nor no consideration . . . but rather the consideration for which Congress provided in § 1404(a)."  *Id.* (internal quotation omitted).  Additionally, as a general rule, a forum selection clause is "prima facie valid" and is enforceable unless it is shown to be unreasonable.  *Id.*

The plaintiff contends that the forum selection clause should not be enforced because it is the result of unreasonable "overreaching." (Docket No. 3 at 17.) That is, the plaintiff was provided with an unalterable adhesion contract that contained the forum selection clause and, while the plaintiff "is a sophisticated business party," it had "little leverage" against an "industry giant" such as the defendant. (*Id.* at 17.) The plaintiff argues that, despite its lack of connection to Florida, it had "no choice" but to accept the terms if it wanted to do business with the plaintiff.

The plaintiff's argument is not convincing. As the plaintiff must concede, it is a sophisticated party who, in fact, did have a choice – it could accept the defendant's terms or elect not to do business with the defendant. The Sixth Circuit has rejected similar *post hoc* protestations of "strong arming" in the past. *Interamerican Trade Corp. v. Companhia Fabricadora de Pecas*, 973 F.2d 487, 489 (6th Cir. 1992)("ITC does argue that the clause was a non-negotiable provision of the agreement as to which it had no choice. ITC could have, however, walked away from the contract, being under no compulsion to deal" with the defendant). The same logic applies here; the plaintiff had a real choice – accept the terms or walk away, and the plaintiff chose to accept the terms. On this briefing, the court sees no reason not to accept the forum selection clause as enforceable, and, of course, the clause provides substantial support in favor of transfer.

The parties briefly address the other elements of the Section 1404(a) test. The defendant contends that Florida is a much more convenient forum for Office Depot and, presumably, its witnesses and that "a federal court sitting in Florida will be more familiar with the state law claims asserted in Nukote's Complaint, all of which are governed by the Florida choice-of-law provision." (Docket No. 2 at 17.) In response, the plaintiff argues that it has no connection with

Florida, and that, as a "cash-strapped debtor," it would be "seriously inconvenient" for the plaintiff to pursue this case outside of the district in which the bankruptcy action is pending and where the plaintiff has "legal counsel, has operations, records available for inspection relevant to the Adversary Proceeding and witnesses that would be called to testify in the Adversary Proceeding."  (*Id.* at 18-20.)

Clearly, the forum selection clause is a significant "thumb on the scale" in favor of transfer.  Additionally, given that the defendant is based in Florida and that the plaintiff is not based in Tennessee, it appears that Florida, not Tennessee, may very well be a more convenient forum, overall, for the parties and the witnesses.  Further, the court is unmoved by the plaintiff's claim that it is unfair to have the plaintiff pursue litigation on two fronts when it already has established something of a "litigation center" in Nashville, Tennessee.  The plaintiff agreed to litigate this dispute in Florida and for this dispute to be governed by Florida law, making it highly foreseeable that any litigation between the parties would be conducted in Florida. Moreover, given the far-flung nature of the operations of both companies and the "massive" amount of discovery that this case portends, a lengthy, travel-intensive and expensive litigation is a given, no matter where the litigation takes place.  For all of these reasons, the defendant's Motion to Transfer is well taken and will be granted.[9]

_____

[9] The defendant also seeks additional time to respond to the Complaint in this case. (Docket No. 2 at 18-19.)  The defendant contends that, under the Federal Rules of Bankruptcy Procedure, its response to the Complaint was due on October 13, 2009, a date that has since passed while this motion was pending.  (*Id.*)  As this case will be transferred from this court, it would be inappropriate for this court to set any sort of deadline to respond to the Complaint. That said, given the uncertainty as to the posture of this case up to this point, it would be appropriate for the district court in Florida to set a deadline for response to the Complaint that affords the defendant the full and complete opportunity to respond to the Complaint that is envisioned by the federal rules.

**<u>CONCLUSION</u>**

For the reasons discussed herein, the defendant's Motion will be granted.  The reference of this case to the Bankruptcy Court will be withdrawn and this case will be transferred to the United States District Court for the Southern District of Florida (West Palm Beach Division).

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge